**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAMMY FLETCHER, | Civil Action No.: 10-1499 (JLL) |
| Plaintiff, | |
| v. | |
| ST. JOSEPH REGIONAL MEDICAL CENTER, et al., | **OPINION** |
| Defendants. | |

**LINARES**, District Judge.

This case is a medical malpractice action arising out of the alleged failure to diagnose breast cancer in Plaintiff Tammy Fletcher. The Court notes at the outset that Plaintiff was married and changed her name to Tammy Willis during the pendency of this case. Accordingly, while the Court will refer to Plaintiff by her married name, the transcript and documentary evidence refer to her by both names.

Plaintiff filed the instant action on March 24, 2010, against the following defendants: Dr. Vidor Bernstein, Dr. Madelyn Danoff, Dr. Marc Melincoff, St. Joseph Family Medicine, St. Joseph Regional Medical Center, St. Joseph's Health System, the United States of America (the "Government"), John/Jane Doe Doctors, and John Doe Corporations. (CM/ECF No. 1). Plaintiff asserted the following causes of action: (1) negligence against all defendants and (2) vicarious liability. On April 5, 2011, Dr. Madelyn Danoff filed a motion for summary judgment. The motion, however, was denied as moot based on the parties' stipulation of dismissal with

prejudice as to claims against Dr. Danoff. (CM/ECF No. 31). On May 9, 2011, the Court accepted the parties' stipulation of dismissal with prejudice for any claims and cross claims against St. Joseph Family Medicine and Dr. Marc Melincoff. (CM/ECF No. 37). The Court had previously set a trial date in this matter for April 2, 2012. (CM/ECF No. 54). At the time, all parties were operating under the assumption that Plaintiff's cancer was in remission. However, by way of a letter dated February 28, 2012, counsel for Plaintiff informed the Court that her breast cancer had returned and that, as a result, additional discovery was necessary. (CM/ECF No. 56). Accordingly, the Court adjourned the trial to March 4, 2013. (CM/ECF Nos. 65, 88). Plaintiff thereafter settled her claims as to all defendants except for the Government in advance of trial and informed the Court of this on the morning of March 4, 2013, the day that jury selection was scheduled to begin. Inasmuch as the only remaining defendant was the United States of America, the matter proceeded as a bench trial. A four-day bench trial was held from March 4 through March 7, 2013. Following hereafter are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.  FINDINGS OF FACT

The Court has considered the testimony and assessed the credibility of all of the witnesses that testified and has also considered the documentary evidence presented at trial and finds as follows:

1.        On December 17, 2002, at the age of forty-one, Plaintiff Tammy Willis presented

to Paterson Community Health Center in Paterson, New Jersey ("PCHC")  and

was seen by Dr. Karen York-Mui Yung ("Dr. Yung").  (Stipulated Facts ¶ 2).

The parties agree that Dr. Yung was an employee of PCHC who was acting

within the scope of her employment during the relevant time period.  (Stipulated

Facts ¶ 1).  PCHC was deemed eligible for coverage under the Federal Tort

Claims Act ("FTCA") throughout the relevant time period.  (Stipulated Facts ¶ 1).

2.        During the 2002 visit, Dr. Yung noticed a fibroid, or a palpable benign tumor, in

Plaintiff's uterus.  (Ex. P-1; Tr. 3.87:17-19).  Accordingly, Dr. Yung referred

Plaintiff to a GYN for the uterine fibroid.  (Ex. P-1; Tr. 3.88:4-6).  In addition, Dr.

Yung conducted a breast exam and was unable to palpate any masses.  (Ex. P-1;

Tr. 3.88:10-14).  Despite not being able to feel any masses in Plaintiff's breasts

during the manual breast exam, Dr. Yung referred Mrs. Willis for a screening

mammogram.  (Ex. P-1; Tr. 3.88:13-19).

3.        Mrs. Willis went to get the prescribed screening mammogram on or about January

21, 2003.  (Ex. P-1).   The results of this study were negative and were intended

as a baseline study for Plaintiff.  *Id.*  Importantly, the report indicated that Mrs.

Willis had very dense breasts and that, as a result, the sensitivity of a screening

mammogram is limited.  *Id.*  The report also noted that the density of the breast

can obscure an underlying neoplasm, commonly referred to as a tumor.  *Id.*

Finally, the report recommended that Mrs. Willis get a mammogram every year.

*Id.* Dr. Yung testified that she was aware that Plaintiff needed to get mammograms every year. (Tr. 3.129:23-130:1).

4.       Subsequently, Mrs. Willis presented to St. Joseph Regional Medical Center ("St. Joseph's") and obtained a mammogram bilateral screening on March 7, 2005. (Ex. P-5). The results indicated, in relevant part, as follows:

> Craniocaudal and mediolateral oblique views show a marked amount of residual heterogeneous densities in both breasts, which limits the sensitivity of this examination in the detection of underlying pathology. The false/negative rate for bilaterally dense breasts approaches 50%. If there are any areas of clinical concern, sonography is recommended.
>
> There are no obvious spiculated masses, suspicious clustered microcalcifications, areas of architectural distortion, or any skin or nipple abnormalities.
>
> Because of the markedly dense breasts, spot compression views are recommended.
>
> CONCLUSION:
> Markedly dense breasts bilaterally. Spot compression views recommended and, if needed, sonography recommended.

(Ex. P-5; Tr. 2.63:7-2.64:20). On April 5, 2005, Dr. Marc Melincoff referred patient for spot compression views and a bilateral ultrasound. (Ex. P-5; Tr. 2.66:14-16). As a result, on April 11, 2005, Plaintiff obtained additional views including "true lateral views and spot compression views in the oblique and craniocaudal projections." (Ex. P-5). The diagnostic studies revealed that there was "no radiographic evidence of malignancy" but that "annual mammography was recommended." (Ex. P-5.; Tr. 2.67:3-9).

5.          Thereafter, Dr. Yung saw Mrs. Willis two additional times, once in 2006 and once

in 2007, at which time it is alleged the malpractice occurred.  Both times, Plaintiff

testified that she presented complaining of a lump in her right axilla, commonly

referred to as an underarm, and right side pain.  The parties do not dispute that Dr.

Yung's record of both visits was incomplete.

6.          Plaintiff's expert, Dr. Paul Genecin, and defense expert, Dr. Jeffrey Carson, both

qualified to testify as an expert in the field of internal medicine, testified that the

applicable standard of care required Dr. Yung to record an adequate history of the

lump in the axilla and a history of the pain in both 2006 and 2007.  In addition,

Dr. Genecin testified that the standard of care required Dr. Yung to record an

adequate mammography history in 2006.  The Court has assessed the testimony,

finds it credible, and finds that Dr. Yung deviated from the applicable standard of

care by failing to document the patient's history and symptoms during both the

2006 and 2007 visits.  For example, in 2006, Dr. Yung failed to document the

history and associated symptoms of the lump, including its size, whether it waxed

and waned with Plaintiff's menstrual cycle, and whether it was associated with

any symptoms indicative of an infection, such as a fever.  In addition, the 2007

record also omits a history of the lump, such as whether it was growing or

otherwise changing, whether it was associated with pain or skin changes, and

whether it fluctuated with Plaintiff's menstrual cycle.  Nor do the records contain

an adequate history of Plaintiff's previous mammography and diagnostic

workups.

7.      On August 9, 2006, Dr. Yung saw Mrs. Willis as a walk-in patient.  Plaintiff
        requested a mammogram and also indicated to Dr. Yung that she had the
        following symptoms: irregular menses, right side pain and a lump.  (Ex. P-1).
        Plaintiff testified that, at the time, she felt something the size of a pimple under
        her skin in the right axilla.  (Tr. 3.25:4-21).

8.      Dr. Yung testified that upon reading the reasons for the visit recorded during
        intake, the first thing that came to her mind was breast cancer.  (Tr. 3.103:20-25;
        3.118:24-119:1).  However, Dr. Yung did not refer Plaintiff for a mammogram
        and did not obtain an adequate mammogram history; rather, she prescribed an
        antibiotic.  Nor did Dr. Yung inform Plaintiff that she needed to follow up if the
        pain and lump persisted despite taking the antibiotic.

9.      The adult progress note from the 2006 visit indicates that Dr. Yung took a urine
        sample, prescribed Keflax which may be used to treat boils, and referred Plaintiff
        to a GYN for the benign uterine fibroid.  (Ex. P-1).  Notably, the medical record
        does not indicate that Dr. Yung performed a breast exam or inquired about
        Plaintiff's mammogram history, despite the fact that Plaintiff came to the clinic
        requesting a mammogram and complaining of pain in her breast and axilla.  Nor
        does the record contain anything about a lump in the underarm or right side pain,
        as mentioned above.  However, the adult progress note does contain check marks
        next to a number of categories, including, skin, eyes, ears, throat, teeth, and neck.
        (Ex. P-1).  It also contains a drawing, which Dr. Yung testified represents
        Plaintiff's uterine fibroid.  (*Id.*; Tr. 3.96:16-20).  In other words, the adult

progress note reflects that everything is normal, except the presence of a uterine fibroid. However, as pointed out by Dr. Genecin, other than the benign fibroid, any mention of the most significant abnormality, namely a lump and pain, is curiously absent.

10.      There was contradictory testimony at trial about what Dr. Yung diagnosed as a boil and whether it was indeed a boil, or whether it was a cyst on Plaintiff's opposite arm, or a swollen lymph node which could have been the lump in her right axilla. Dr. Yung testified that there was a boil located on Plaintiff's right arm towards the bicep above the elbow. (Tr. 3.97:15-98:9). While it is unclear from the testimony at trial where it was located or whether the diagnosis was correct, the Court finds credible that Dr. Yung believed that it was a boil, as indicated by the fact that she prescribed Keflax and also from the notes in the assessment, however limited. Notably, however, there is no mention of a boil in the physical examination section of the chart. (Ex. P-1).

11.      While there is no record of a breast exam or other documentation of Mrs. Willis's pain or lump, in light of the testimony adduced at trial, the Court finds that a breast exam was in fact completed, although not recorded. Specifically, Dr. Yung's testimony that she did not feel a lump in Plaintiff's right axilla in conjunction with Mrs. Willis's testimony that Dr. Yung informed her that if there was in fact a lump, it was a swollen lymph node in connection with what was diagnosed as a boil, seems to indicate to this Court that a breast exam performed.

12.     Despite the fact that Plaintiff requested a mammogram during the 2006 visit, Dr. Yung did not order a mammogram. It was Dr. Yung's testimony at trial that she believed that Plaintiff was not yet due for a mammogram. In fact, it had been sixteen months since Mrs. Fletcher's previous mammogram and, as a result, she was therefore overdue. (Tr. 2.28:3-7; 2.89:20-90:5; 2.92:9-19).

13.     Dr. Genecin testified credibly that the applicable standard of care requires that when a patient in her forties, Mrs. Willis's age at the time, complains of breast pain and can palpate a lump, certain tests are required, including biopsy and diagnostic studies, such as a bilateral screening mammogram. (Tr. 2.20:9-18). In addition, defense expert Dr. Jeffrey Carson, board certified in internal medicine, testified regarding the appropriate standard of care. The Court, however, finds less credible the testimony of defense expert Dr. Carson as to what the standard of care in fact required due, in part, to his testimony that he was not aware of certain applicable guidelines and that he did not know what the standard of care required. (Tr. 4.28:20-24; 4.62:25-64:19; 4.98:3-21).

14.     The Court, however, finds the testimony of Dr. Genecin credible when he indicated that when cancer is on the differential diagnosis, tests that are more sensitive than a screening mammogram are also required. Accordingly, the Court finds that Dr. Yung deviated from the requisite standard of care by not referring Plaintiff for a diagnostic study and biopsy in 2006.

15.     Defense expert Dr. Carson testified that treating present symptoms, such as prescribing Keflax for what Dr. Yung thought to be a boil, would be acceptable in

conjunction with continuing to monitor the patient to see if the patient responds to that treatment. (Tr. 4.24:13-23). However, even accepting as true Dr. Carson's testimony, Dr. Yung deviated from that standard by not formulating a follow up plan should the pain and lump not dissipate or otherwise communicating to Plaintiff that she needed to seek additional medical attention if that were the case. (Tr. 4.25:11-19; 4.26:20-27:6; 4.52:17-53:1; 4.54:24-55:5).

16.  Dr. Yung testified that she told Mrs. Willis that she did not feel anything in the axilla but that any inflammation would go away with the antibiotic. (Tr. 3.101:8-14). She also told Plaintiff that if the boil did not heal with the antibiotic, she could come back. (Tr. 3.100:18-21).

17.  Dr. Yung also testified that she believed that Mrs. Willis was not yet due for a mammogram but that she referred Plaintiff to a gynecologist who would prescribe one. (Tr. 3.104:17-21). The Court does not find that testimony credible in light of Dr. Yung's subsequent testimony that she believed Plaintiff would "just go upstairs and make [an] appointment" and that she would be seen soon thereafter. (Tr. 3.106:5-25).

18.  Based on the evidence presented at trial, this Court is convinced that the standard of care required Dr. Yung to order at least a screening mammogram at that time. To the extent that the screening mammogram raised any questions, follow up tests should have been ordered in light of Plaintiff's clinical presentation. Accordingly, in 2006, Dr. Yung's treatment of Plaintiff fell below the required

standard of care in light of the specific complaints with which Mrs. Willis presented, namely, pain and a lump.

19.     On June 19, 2007, Plaintiff once again presented to the PCHC and saw Dr. Yung. Dr. Yung referred Plaintiff for a screening mammogram, which Plaintiff obtained on August 15, 2007. (Ex. P-1). Dr. Yung's recorded assessment in the adult progress note is quite limited but reflects the following: (1) referral for a screening mammogram; (2) referral to a gynecologist regarding the uterine fibroid; and (3) a prescription for a cream. (Ex. P-1). Notably, the adult progress note once again contains check marks next to a number of categories, including, skin, eyes, ears, nose and teeth. (*Id.*). It also contains a picture, which Dr. Yung testified represented a uterine fibroid. (*Id.*; Tr. 3.109:10-12). Importantly, as discussed above, the adult progress note does not contain information regarding a breast exam or adequate history of Plaintiff's lump and pain.

20.     Although, once again, the medical records from this visit with Dr. Yung do not mention a breast exam, the Court finds that one was in fact completed based on the determination that Dr. Yung did not adequately document the visit in conjunction with the testimony adduced at trial and circumstantial documentary evidence. Specifically, the intake questionnaire filled out by Plaintiff in advance of her subsequent screening mammogram at St. Joseph's indicates that the reason for the mammogram was pain and a lump that the doctor could not feel. (Ex. P-5). However, there was contradictory testimony given by Dr. Yung and Mrs.

Willis regarding what the breast exam consisted of and whether it was properly conducted.

21.     The Court has carefully assessed the testimony of the Plaintiff, finds her to be a very credible witness, and finds that Plaintiff credibly testified that the lump in her axilla felt like a marble at or around the time of this visit. (Tr. 3.25:19-26:8). In addition, expert witness Dr. Richard Hirschman, testified that based on the limited information from the mammogram conducted in 2007, there was a mass of four by three by two centimeters. (Tr. 2.111:3-10). Based on his calculations, on or about June or August of 2007, the tumor was about four centimeters, with more than three lymph nodes positive but no metastasis. (Tr. 2.111:23-112:2).

22.     The Court finds credible the testimony of Dr. Genecin when he opined that when a patient complains of clinical problems, such as pain and a lump, in an area associated with breast cancer, the standard of care requires diagnostic studies, which are more comprehensive than a screening mammogram.  (*See e.g.* Tr. 2.90:8-15, 2.90:21-91:5).  Indeed, defense expert Dr. Carson conceded that a screening mammogram would be appropriate if the patient did not "refer" to her breast. (Tr. 4.32:8-10).  Under the facts of this case, in light of Plaintiff's complaints of a lump that the doctor could not palpate and pain in that area, the standard of care required that Dr. Yung order diagnostic studies of Plaintiff's right breast and axilla.  This is particularly so because Plaintiff presented with the same symptoms the previous year, and because Dr. Yung had knowledge that Plaintiff had dense breasts.

23.      The screening mammography report was read by radiologist, Dr. Vidor Bernstein, as a negative report, but indicated the following, in relevant part:

> **FULL RESULT:**
>
> The skin, nipples and areolae bilaterally are symmetric and within normal limits. Dense fibroglandular stroma bilaterally is again evident with no evidence of a dominant mass, distortion, hyperemia, or calcification.
>
> There are a couple of fairly prominent nodes in the right axilla.
>
> Compared with 3/7/05, and follow-up examination of 4/11/05, there has been no significant interval change.
>
> **CONCLUSION:**
> No evidence of neoplasia.
>
> BIRADS CATEGORY 1: Negative.

(Ex. P-1). Importantly, the "fairly prominent nodes" were in the right axilla, the precise area where Plaintiff had been complaining of pain and a lump to Dr. Yung for over a year. Dr. Yung informed Plaintiff that the test was negative and did not otherwise follow up with Plaintiff or another doctor.

24.      Dr. Carson credibly testified that the standard of care does not require an internist to second-guess the report and finding of a radiologist interpreting a mammogram. (Tr. 4.38:20-39:2). However, the Court finds that, based on the testimony of expert witness Dr. Genecin, the standard of care in the context of Mrs. Willis's medical presentation required Dr. Yung to order diagnostic tests in light of the screening mammography finding that there were fairly prominent nodes in the *precise* area where Dr. Yung knew that Plaintiff was complaining of pain and a lump. Dr. Yung testified at her deposition that she was unaware of

what fairly prominent nodes meant but that it was a negative report. During cross-examination, however, she admitted that she did know what fairly prominent nodes meant. (Tr. 3.132:12-15). Even if she did not understand that term, the applicable standard of care requires that a doctor take appropriate steps to understand the basics of the report and provide the appropriate follow up care. (Tr. 2.72:25-73:18). The standard of care also requires that a doctor formulate a plan to follow up or monitor a patient of Plaintiff's age at the time complaining of the symptoms with which she presented. (Tr. 2.71:22-72:13). Dr. Yung deviated from the applicable standard of care in both regards.

25.    The following year, 2008, Plaintiff obtained medical treatment in Delaware. Doctors there ordered magnetic resonance imaging, commonly referred to as an MRI. On or about May 9, 2008, Plaintiff was told by her treating physician in Delaware, Dr. Pahnke, that she had advanced Stage III AB cancer and would need a mastectomy. (Tr. 3.37:24-38:7, 3.39:5-7, 3.40:15-19). Mrs. Willis obtained a second opinion from another doctor, which was substantially the same. (Tr. 3.39:21-25). At that time, Plaintiff had 17 out of 27 lymph nodes positive and a tumor size of approximately eight centimeters. (Tr. 2.107:22-23; Tr. 2.118:18-19).

26.    Thereafter, Plaintiff received chemotherapy, radiation, and a mastectomy. (Tr. 3.40:17-41:24). Due to the size of the tumor and stage of the disease at the time of diagnosis, Plaintiff required neoadjuvant chemotherapy, or chemotherapy in advance of surgery in order to shrink the size of the tumor before its removal,

which credible expert testimony established was approximately eight centimeters at the time of diagnosis. (Tr. 2.107:22-23; 2.117:15-19). Significantly, the expert testimony of Dr. Hirschman also credibly established that, had Plaintiff been timely diagnosed in 2006, she would not have needed a mastectomy.

27. After receiving a mastectomy, doctors placed an expander in Plaintiff's chest so she could get reconstructive surgery, including breast implants. (Tr. 3.42:9-14). However, the expander required three surgeries, which, as doctors explained to Plaintiff, was due to the effects of radiation on her skin. (Tr. 3.42:11-14). At one point, the expander ripped through Plaintiff's skin on her chest. Plaintiff decided to use a prosthetic breast instead of undergoing further reconstructive surgery. (Tr. 3.42:16-24).

28. In addition, the credible testimony of oncology expert Dr. Hirschman established that if a diagnostic breast workup had been done in 2006, it would have revealed cancer at an early stage with a tumor size of less than two centimeters and with fewer than four positive nodes. (Tr. 2.102:25-103.5). Plaintiff's projected rate of survival over a period of ten years would have been 87.4 percent. (Tr. 2.103:6-7).

29. If, on the other hand, a diagnostic workup had been done in 2007, Plaintiff's breast cancer would have been diagnosed at that time as a tumor between three and five centimeters with less than nine nodes positive. Plaintiff's ten-year survival rate would have been 72 percent. (Tr. 2.103:10-16).

30. When Mrs. Willis was finally diagnosed with cancer in 2008, twenty-one months after presenting to the PCHC requesting a mammogram and complaining of pain

and a lump, her tumor size was greater than six centimeters and seventeen out of twenty-seven nodes were positive. Notably, when removed, the tumor was six centimeters, but at the time of diagnosis, before the initial neoadjuvant chemotherapy, the lump was approximately eight centimeters. (Tr. 2.107:22-25). While the precise size of the tumor at the time of diagnosis is unknown due to the fact that Plaintiff underwent neoadjuvant chemotherapy before the mastectomy, the Court finds credible the testimony of Dr. Hirschman in this regard. Indeed, there was no evidence introduced to the contrary. Dr. Hirschman's cross-examination by defense counsel, regarding the size and precision of the method used to estimate the size of the tumor, the number of nodes, and whether there was malignancy, was effective. However, the Court finds, by a preponderance of the evidence, that the tumor was approximately eight centimeters at the time of the initial breast cancer diagnosis in 2008.

31.    Dr. Hirschman credibly testified that due to the delay in diagnosis, Plaintiff's survival rate over a period of ten-years is now zero. (Tr. 2.103:22-104:88). Accordingly, the Court finds that Dr. Yung's negligence was a substantially contributing factor to the ultimate injury suffered by Plaintiff.

32.    In advance of Plaintiff's initial cancer treatment, she reunited with the man she ended up marrying during the course of her treatment. (Tr. 3.43:14-23). Plaintiff eventually finished her treatment, went into remission, and, in January of 2011, she moved to Colorado with her husband. (Tr. 3.45:19-46:1, 3.43:24-44:1). Doctors continued to monitor Plaintiff on a regular basis. (Tr. 3.45:23-24).

33.     For much of Mrs. Willis's life, she earned a living as a hair stylist in a number of salons in New Jersey. She also had various jobs including working at a department store, at a fast food establishment, and as a telephone operator. (Tr. 2.167:3-10). At the time that Plaintiff was diagnosed with breast cancer, however, she had already undergone the requisite training, obtained a certification, and begun a career working with mentally challenged adults. (Tr.3.39:10-3.40:3). Plaintiff was a direct care support specialist on a full-time basis with overtime. (Tr. 3.40:4-7, 2.167:12-15). In addition to administering medications, Plaintiff testified that her job responsibilities consisted of the following: "I would do their banking, shopping, cooking, documentations, everything, doctors appointments, everything." (Tr. 3.39:17-21).

34.     Upon moving to Colorado with her husband, Plaintiff worked as a security guard at a warehouse until she was able to transition back to working with mentally challenged adults. (Tr. 3.44:5-12). Mrs. Willis began working for Developmental Pathways, where she planned to stay until retirement. (Tr. 3.44:25-4).

35.     In February of 2012, while completing training in connection with her job at Developmental Pathways, Plaintiff injured her back. Mrs. Willis testified that she obtained an MRI in connection with that injury. (Tr.3.46:10-13). A subsequent PET CT Scan, obtained on February 24, 2012, revealed, in relevant part, that there were "innumerable FDG-avid osteolytic lesions throughout the axial skeleton and bilateral proximal femora":

> innumerable, intensely FDG avid osteolytic lesions throughout the
> axial skeleton. Lesions are seen in right skull base, numerous
> cervical/thoracic/lumbosacral vertebrae, multiple bilateral ribs, left

> scapula, and multiple bilateral pelvic pones. FDG avid lesions are
> also seen in bilateral proximal femora. One of the larger and more
> intensely FDG avid lesion is seen in L1 vertebra on the right,
> extending to involve the pedicle, transverse process and lamina.
> These lesions are all new since August 25, 2011 CT.

(Tr. 2.120:13-22). In other words, Plaintiff had cancer in her spine, skull,

multiple ribs, thigh bones, pelvic bones, and left scapula. (Tr. 2.119:7-121.2).

Plaintiff's doctor in Colorado told her that she had a life expectancy of two years

from that time. (Tr. 3.24:10-16).

36.      Credible expert testimony revealed that Plaintiff currently has full body skeletal

cancer, there is no known cure for Plaintiff's current condition, and that she will

likely survive less than two years. (Tr. 2.102-22:24). In addition, the expert

testimony of Dr. Hirschman credibly established that the delay in diagnosing her

cancer is what caused Plaintiff to have a zero percent chance of survival over a

ten-year period. (Tr. 2.103:24-104:8). Dr. Hirschman also testified that the likely

progression of the cancer is as follows:

> She has progressive skeletal disease, but as the disease starts
> growing, it escapes from the bones where it has been sitting for a
> few years causing a lot of pain and suffering, but not threatening
> her life, and in one part of the spine, in the lower spine, there is a
> large concentration of cancer. If this erodes the spine and there is a
> collapse of the vertebrae, she might become paralyzed, which
> frequently happens unfortunately. But there is also – not just the
> likelihood, the inevitability of this cancer spreading from the bones
> to the vital organs. Soon she will show up with cancer evident in
> her lungs, her liver, and her brain, and that will be progressive and
> cause her demise.

(Tr. 2.123:11-23).

37.      Dr. Hirschman testified further that Plaintiff

Page 17 of 27

is going to die as a result of her cancer spreading, and in the process we know she is in a lot of pain, and because it is lodged in the bones, and as the cancer expands in the bone and destroys the bone, the pain is – can be excruciating requiring that she be on narcotics, which she is, and narcotics have side effects. It makes you lose your appetite, slows down your intestines, so you become severely constipated, and you are not entirely there socially, but they are necessary to suppress the pain.

(Tr. 2.125:3-14). Plaintiff also suffers from the following: swelling in the right arm caused by the mastectomy; a weakened heart due to the drugs being prescribed; a low blood count which makes her susceptible to infections; hand-foot syndrome, which is characterized as pain in the hands and feet and associated disability; and total body pain. (Tr. 2.125:15-25). In addition, the experimental drug which Mrs. Willis is taking causes high blood pressure. (Tr. 2.125:15-19). Finally, Plaintiff is experiencing liver dysfunction, the cause of which is not clear, but it may be the disease spreading to her liver. (Tr. 2.125:4-6).

38.     Plaintiff also testified that she lives with constant pain and that she experiences constant nausea associated with the pain medication. (Tr. 3.49:3-6). In addition, Mrs. Willis had no choice but to go on pain medication, despite the fact that she initially resisted due to the fact that she is a recovering drug addict, who had been long sober. (Tr. 3.49:8-14). She also experiences frequent dizziness and feels faint or like she will fall. (Tr. 3.49:18-25). She also experiences fear of dying and constant anxiety, and can no longer partake in much of life's pleasures. (Tr. 3.47:4-50.12).

39.     The Court finds that in conjunction with Plaintiff's lost chance of survival, Plaintiff's compelling and credible testimony establishes substantial damages.

The Plaintiff in this case suffered extensive disfigurement, pain, suffering, loss of enjoyment of life, anxiety, and fear of dying, all of which were set forth in detailed and credible testimony. Each of these items of damages was extensive and totally substantiated by the evidence. Accordingly, the Court finds that a non-economic damages award in the amount of $3,250,000.00 is appropriate to compensate the plaintiff for said damages.

40.    As a result of Plaintiff's disabling condition, she has been precluded from gainful employment. (Tr. 2.125:21-126:1).

41.    David Hopkins, qualified as an expert in the field of actuarial and economic science, testified regarding Plaintiff's economic loss, which consists primarily of the loss of earning capacity, fringe benefits, and household services. (Tr. 2.148:9-15). Mr. Hopkins based his report on Mrs. Willis's earning history, educational background, family situation, and what led to her disability. (Tr. 2.148:4-8).

42.    Mr. Hopkins determined Plaintiff's past lost earning capacity, including fringe benefits. He also predicted Plaintiff's likely future lost earning capacity, including fringe benefits, based on a work life expectancy if Plaintiff had remained working until age sixty, age sixty-five, and age seventy. (Ex. P-36A). In addition, Mr. Hopkins took into account past and future household services. *Id.*

43.    Based on Plaintiff's testimony regarding her ability to retire and her intent to remain at Developmental Pathways, the Court finds it appropriate to assume that she would have continued working until age sixty-five. Mr. Hopkin's analysis

also took into account various assumptions regarding the interplay between earnings increases and present value investment returns. (Tr. 2.162:13-19). Mr. Hopkins credibly testified that current public policy and the present economic situation have resulted in earnings increases and investment returns near zero. (Tr. 2.163:21-25). Recognizing, that those values fluctuate, Mr. Hopkins predicted that if Mrs. Willis retired at age sixty-five, her economic damages would be somewhere between $539,762 and $705,389, depending on the interplay of the assumptions discussed above. However, the Court will make a slight downward adjustment to the figures put forth by Mr. Hopkins based on Plaintiff's previous inconsistent work history and her testimony that, while in Colorado, she had not attained a salary and overtime pay commensurate with that of her job working with the mentally challenged in Delaware. (Tr. 2.44:15-21, 3.64:17-65:4). Accordingly, the Court finds that the total amount of lost past and future earning capacity, fringe benefits, and household services is $500,000.00.

## II.    CONCLUSIONS OF LAW

"A medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship. Thus, a plaintiff in a malpractice action must prove the applicable standard of care; that a deviation has occurred; and that the deviation proximately caused the injury." *Verdicchio v. Ricca*, 179 N.J. 1, 23 (2004) (citations omitted). "New Jersey, like many jurisdictions, has adopted a modified standard – the substantial factor standard – 'limited to that class of cases in which a defendant's

negligence combines with a preexistent condition to cause harm – as distinguished from cases in which the deviation alone is the cause of harm.'" *Id.* at 24 (citing *Battenfeld v. Gregory,* 247 N.J. Super. 538, 549 (App. Div. 1991)); *Scafidi v. Seiler,* 119 N.J. 93, 108-09 (1990).

The appropriate inquiry under the substantial factor test is "whether the defendants' deviation from the standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm." *Verdicchio,* 179 N.J. at 24 (quoting *Gardner v. Pawliw,* 150 N.J. 359, 376 (1997)); *Scafidi,* 119 N.J. at 108-09. Accordingly, in a failure to diagnose case, a plaintiff must demonstrate that the defendant's deviation from the standard of care was a cause "in fact," or increased the risk of harm from the preexisting condition. The question then becomes whether "the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm." *Scafidi,* 119 N.J. at 109. A defendant's deviation need not be the only cause to constitute a substantial factor; rather, "[i]t must play a role that is both relevant and significant in bringing about the ultimate injury." *Reynolds v. Gonzalez,* 172 N.J. 266, 288 (2002); *Verdicchio,* 179 N.J. at 30.

Based on the facts of the instant case, the Court finds that Dr. Yung's deviations from the standard of care both increased Mrs. Willis's risk of harm and diminished her chance of survival. With regard to diminished chance of survival, the evidence at trial established by a preponderance of the evidence that had Mrs. Willis been diagnosed in 2006, she would have had an 87.4% rate of survival over ten years. Similarly, had Mrs. Willis been diagnosed in 2007, she would have had a 72% rate of survival over a ten-year period. Due to the delay in diagnosis, her survival rate is now zero over the same period.

As to increased risk of harm, as discussed above, credible expert testimony of Dr. Hirschman demonstrated by a preponderance of the evidence that had Dr. Yung properly diagnosed or referred Mrs. Willis for the appropriate test in 2006, Mrs. Willis would not have required a mastectomy. Nor would she have required multiple reconstructive surgeries or experienced the associated complication of having expander material rip through her skin. In addition, Dr. Yung's failure to document a history of the pain and lump significantly contributed to her inability to properly recognize that Mrs. Willis had been complaining of the same symptoms a year prior.

The Court finds that each of Dr. Yung's deviations from the standard of care substantially contributed to the ultimate injury. First, Plaintiff demonstrated with a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by Plaintiff's preexistent condition, breast cancer. As noted by the New Jersey Supreme Court, "'the passage of time' with concomitant '[d]elay in treatment almost invariably results in a more serious prognosis." *Verdicchio*, 179 N.J. at 32 (quoting *Evers v. Dollinger*, 95 N.J. 399, 409 n.4 (1984)) (alteration in original); *see also* Tr. 2.104: 14-16 (Dr. Hirschman testified that "[e]arly diagnosis is the key to cure. The earlier you diagnose breast cancer, the more likely it is that the treatment will be curative.").

Second, while Defendant argues that Dr. Yung was not negligent, Defendant does not argue that the delay in diagnosis was not a substantial factor in bringing about Plaintiff's ultimate harm. As discussed above, the expert testimony in this case demonstrated by a preponderance of the evidence that the delay in diagnosis resulted in a substantial decrease in Plaintiff's chance of survival as well as the increased risk of harm. (Tr. 2.104:6-8). In addition, Dr. Yung's

negligence and failure to timely diagnose Plaintiff's breast cancer necessitated additional surgeries, most significantly a mastectomy.

## A. Apportionment of Damages

Having determined that Plaintiff satisfied her burden of demonstrating that Defendant's deviations from the applicable standard of care were a substantial factor in bringing about Plaintiff's ultimate injury, the Court now turns to whether apportionment of damages is appropriate. "To the extent that a plaintiff's ultimate harm may have occurred solely by virtue of a preexistent condition, without regard to a tortfeasor's intervening negligence, the defendant's liability for damages should be adjusted to reflect the likelihood of that outcome." *Scafidi*, 119 N.J. at 112-13. Therefore, in order to apportion damages, a defendant must produce evidence tending to show that the ultimate injury could have been attributable solely to the preexistent condition, irrespective of defendant's negligence. *Id.* at 113-14; *Fosgate v. Corona*, 66 N.J. 268, 272-73 (1974). Here, Defendant did not adduce sufficient proof to allow the Court to determine the value of the lost chance of survival attributable to Dr. Yung's negligence. Indeed, Defendant did not introduce any evidence as to which portion of Mrs. Willis's damages were attributable to her preexisting condition, breast cancer, and which were due to Dr. Yung's negligence.

Defendant argues that there should be a reduction in light of the fact that the quality of the medical care Plaintiff received after 2008 is not in dispute. During the cross examination of Dr. Hirschman, it came to light that his initial report indicated that Plaintiff's survival rate in 2008 was 49.4% over a ten-year period while Plaintiff was in remission. Defendant argues that "assuming *arguendo* that the Court finds that defendant was in fact negligent in this case, the

defendant submits that the number ascribable to the defendant's negligence should be 38% *or less.*" (Def. Br. 3). Defendant reasons that based on the testimony of Dr. Hirschman regarding Plaintiff's chance of survival in 2006, 2007, and 2008, "assuming that negligence as early as 2006 deprived the plaintiff of a chance for recovery from that time until May of 2008, the lost chance for which defendant is responsible is *at most* 87.4% minus 49.4%, or 38%. (Def. Br. 3). Defendant further argues that the problem with comparing Plaintiff's chance of survival in 2006 with her current chance of survival, as opposed to that predicted in 2008, is that Mrs. Willis "began receiving what by all accounts was proper care in May of 2008 when she still had a 49.4% chance of survival, and despite receiving proper care she was found to be terminal four years later. It is simply inequitable and not in keeping with *Scafidi* to charge defendant with this additional lost chance of 49.4% because subsequent appropriate treatment was unsuccessful." (Def. Br. 3). However, there was no evidence introduced at trial which would contradict or otherwise call into question Dr. Hirschman's credible testimony that *as a result of the delay in diagnosis*, Plaintiff's survival rate over a ten-year period is now zero. Accordingly, Defendant does not meet its burden of demonstrating that it is entitled to a reduction in accordance with *Scafidi*.

**D. Settlement Credit**

Finally, on the morning that the Court was scheduled to begin jury selection, Plaintiff reached an amicable agreement with Defendants Dr. Vidor Bernstein and Saint Joseph's Regional Medical Center. Defendant submits that "[i]t is the position of the United States that, to the extent there is a finding of liability and an award of damages against the United States, the Court should consider evidence regarding the potential liability of its former co-defendants and

reduce any award against the United States accordingly." (Def. Br. 5). Accordingly, the United States, as the sole remaining defendant, argues that it should be entitled to *pro rata* contribution from the settling defendants.

"Clearly, a non-settling defendant has the right to have a settling defendant's liability apportioned" by the fact finder. *Green v. Gen. Motors Corp.*, 310 N.J. Super. 507, 545 (App. Div. 1998), *cert. denied*, 156 N.J. 381 (1998) (citation omitted).  In order to obtain a credit, the "non-settling defendants must provide plaintiffs 'with fair and timely notice' of the intent to pursue a credit, and must prove liability." *Verni ex rel Burstein v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 209 (App. Div. 2006) (citing *Young v. Latta*, 123 N.J. 584, 587 (1991); *Green*, 310 N.J. Super. at 546)).  "If no issue of fact is properly presented as to the liability of the settling defendant, the fact finder cannot be asked . . . to assess any proportionate liability against the settler." *Green*, 310 N.J. Super at 546 (quoting *Young v. Latta*, 223 N.J. Super. 520, 526 (App. Div. 1989)).

In this case, Plaintiff argues that Defendant "failed to allege well before trial the causative fault of a co-defendant and, therefore, any last minute attempt to do so would be unduly prejudicial to Plaintiff." (Pl. Br. 6).  However, the United States asserted a cross-claim for contribution against the settling defendants. (CM/ECF No. 19).  Accordingly, Plaintiff has had sufficient notice of Defendant's effort to raise the issue of the settling defendant's negligence. *Carter v. Univ. of Med. and Dentistry of N.J.*, 854 F. Supp. 310, 316 (D.N.J. 1994).

However, in the case at bar, no expert qualified to testify about the settling defendants' negligence testified at trial. *See* N.J. Stat. Ann. § 2A:53A-41.  Nor did the United States otherwise establish the liability of the settling defendants.  Therefore, the instant issue concerns

the ability of Defendant to use only the deposition, curriculum vitae, and report of Plaintiff's expert witness to prove the liability of the settling defendants. Defendant does not cite any case in support of the proposition that same is permissible.

In New Jersey, a litigant is not permitted to read the deposition testimony of its adversary into evidence where the party that retained the expert is not calling that witness at trial. *Genovese v. N.J. Transit Rail Operations, Inc.*, 234 N.J. Super. 375, 381-82 (App. Div. 1989), *cert. denied*, 188 N.J. 195 (1989). "The opinion of an expert, as opposed to testimony as to facts perceived, may not ordinarily be compelled against the wishes of the expert." *Id.* at 381. In *Genovese*, the Appellate Division specifically dealt with the use of a deposition as per N.J. Court R. 4:14-9, which permits videotape depositions for discovery purposes or for use at trial. The defendant in that case took a videotaped deposition of an expert witness in advance of trial, but ultimately decided not to use that expert. The plaintiff sought to use the deposition during its case in chief and defendant objected. The Appellate Division clarified that "as a matter of policy, an expert's deposition taken pursuant to R. 4:14-9(e) should not be substantively usable by an adversary over objection." *Genovese*, 234 N.J. Super. at 381. The *Genovese* Court explained that "[f]urtherance of the Rule's purposes dictates that a trial court should not ordinarily permit the use by another party of [a discovery] deposition of a treating physician or an expert as substantive evidence." *Id.* Accordingly, Defendant may not use the deposition of Plaintiff's expert as substantive evidence of the settling defendants' liability.

In addition, Plaintiff argues, and the Court agrees, that the report and deposition of Plaintiff's expert may not be used to establish liability for a wholly unrelated reason. Plaintiff's expert "never once expressed, under oath, the deviations from the standard of care purportedly

Page 26 of 27

committed by Dr. Bernstein." (Pl.'s Br. 5). Nor did she express that her opinions were offered with a reasonable degree of medical certainty. *Id.* Therefore, under the circumstances of this case, Defendant may not use the deposition testimony of Plaintiff's expert, who did not testify at trial, to prove the liability of the settling defendants. Accordingly, the United States is not entitled to a credit from the settling defendants.

## III.   CONCLUSION

For the reasons stated above, neither damages apportionment nor a settlement credit are warranted in this case. Therefore, the Court will enter judgment in favor of Plaintiff in the amount of $500,000.00 of economic damages and $3,250,000.00 of non-economic damages. An appropriate Order and Judgment accompany this Opinion.

Dated:   4-15-13

Jose L. Linares
United States District Judge